# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**JERRIE A. ARCHER**

         Plaintiff,

   v.

**COMMISSIONER OF SOCIAL
SECURITY**

         Defendant.

Case No.   6:12-cv-00767-SI

**OPINION AND ORDER**

Tim Wilborn, Wilborn Law Office, P.C., P.O. Box 370578, Las Vegas, NV 89137.
Attorney for Plaintiff.

Adrian L. Brown, U.S. Attorney's Office, District of Oregon, 1000 S.W. Third Avenue, Suite
600, Portland, OR 97204; Summer Stinson, Social Security Administration, 701 Fifth Avenue,
Suite 2900, M/S 221A, Seattle, WA 98104-7075; Christopher J. Brackett, Social Security
Administration, 701 Fifth Avenue, Suite 2900, M/S 221A, Seattle, WA 98104-7075
Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff, Ms. Jerrie A. Archer, seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits and Supplemental Security Income. For the following reasons, the Commissioner's decision is AFFIRMED.

## BACKGROUND

### A. The Application

Ms. Archer protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 18, 2006, alleging disability beginning on January 1, 1992. Tr. 129-36. She alleges disability due to a combination of impairments, including a right shoulder injury, lumbar spine disease, bilateral hip osteoarthritis, bilateral knee arthritis, obesity, post traumatic stress disorder ("PTSD"), anxiety disorder, and depressive disorder. Tr. 150. The Commissioner denied her application initially and upon reconsideration; thereafter, she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 75-78, 96-98. An administrative hearing was held on April 1, 2010, and a supplemental was held on September 22, 2010, after that the ALJ issued a decision denying Ms. Archer's claims. Tr. 13, 29, 36. After considering additional evidence submitted to it, the Appeals Council denied Ms. Archer's request for review on February 27, 2012, making the ALJ's decision final. Tr. 1-6. Ms. Archer now seeks judicial review of that decision.

### B. The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for

determining whether an applicant is disabled within the meaning of the Social Security Act."

*Keyser v. Comm'r Soc. Sec. Admin.,* 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R.

§ 404.1520 (DIB); 20 C.F.R. § 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Each

step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). The five-step

sequential process asks the following series of questions:

1.  Is the claimant performing "substantial gainful activity?" 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510; 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2.  Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a); 416.921(a). Unless expected to result in death, this impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509; 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.  Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis continues. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e); 404.1545(b)-(c); 416.920(e); 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.  Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R.

§§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.    Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v); 404.1560(c); 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari,* 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett*, 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. §§ 404.1566; 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

**C.  The ALJ's Decision**

The ALJ performed the sequential analysis. At step one, the ALJ found that Ms. Archer had not engaged in substantial gainful activity since August 30, 2005.  Tr. 16.  At step two, the ALJ found that Ms. Archer had the following severe impairments: dominant right shoulder rotator cuff tendiopathy, degenerative changes of acronioclavicular joint, lumbar spine degenerative disk disease, bilateral hip osteoarthritis, right and left knees tricompartmental

osteoarthritis and obesity. *Id*.  At step three, the ALJ determined that Ms. Archer did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 21.

The ALJ then assessed Ms. Archer's residual functional capacity ("RFC") and found that from August 30, 2005, through June 8, 2009, Ms. Archer had the residual functional capacity to perform a full range of sedentary work, except "her postural limitations are all limited to occasional." *Id*. From June 8, 2009, to September 22, 2010, the ALJ found that Ms. Archer had the residual functional capacity to perform a full range of light work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except she cannot repeatedly squat or knee, and she cannot lift or carry more than 50 pounds. *Id*. At step four, the ALJ concluded that Ms. Archer was able to perform her past relevant work as a customer order clerk and a cashier from June 8, 2009, through September 22, 2010.  Tr. 27.  Thus, the ALJ found Ms. Archer was not disabled. Tr. 29.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means "more than a mere scintilla but less than a preponderance." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews*, 53 F.3d at 1039).

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this Court may not substitute its judgment

for that of the Commissioner. *See Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004).

"However, a reviewing court must consider the entire record as a whole and may not affirm

simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625,

630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)

(internal quotations omitted)). The reviewing court, however, may not affirm the Commissioner

on a ground upon which the Commissioner did not rely. *Id.*; *see also Bray,* 554 F.3d at 1226.

## DISCUSSION

Ms. Archer argues that the ALJ erred by: (1) improperly finding her subjective symptom

testimony not credible; (2) improperly rejecting the opinions of Drs. Trueblood, Maloney, and

Henderson; (3) improperly rejecting the lay testimony of her daughter, Sara Ball; and (4) failing

to support with substantial evidence the ALJ's RFC determination and finding at step four.

## A.  Ms. Archer's Credibility

Ms. Archer argues that the ALJ erred in discounting her testimony regarding the severity

of her symptoms. The Ninth Circuit has developed a two-step process for evaluating the

credibility of a claimant's own testimony about the severity and limiting effect of the claimant's

symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine

whether the claimant has presented objective medical evidence of an underlying impairment

'which could reasonably be expected to produce the pain or other symptoms alleged.'"

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947

F.2d 341, 344 (9th Cir. 1991) (*en banc*)). When doing so, the claimant "need not show that her

impairment could reasonably be expected to cause the severity of the symptom she has alleged;

she need only show that it could reasonably have caused some degree of the symptom." *Smolen*

*v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell*, 947 F.2d at 345-46).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186.

Further, the Ninth Circuit has said that an ALJ also "may consider . . . ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a

prescribed course of treatment." *Smolen*, 80 F.3d at 1284. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

### 1. Activities of Daily Living

The ALJ found inconsistencies between Ms. Archer's daily activities and her testimony regarding the severity of her physical symptoms. Tr. 20. An ALJ may draw an adverse credibility finding from inconsistencies between the alleged severity of the claimant's symptoms and his or her self-reported activities. *See Valentine v. Commissioner*, 574 F.3d 685, 693 (9th Cir. 2009); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008). An ALJ may draw a negative inference when the claimant's daily activities either contradict the claimant's other testimony or meet the threshold for transferable work skills. *See Orn*, 495 F.3d at 639. A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support a negative credibility finding. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722–23 (9th Cir. 1998) (requiring the level of activity to be inconsistent with the claimant's claimed limitations to be relevant to his or her credibility).

Ms. Archer asserted that her biggest obstacle to work was pain in her shoulders, wrists, and legs. Tr. 23. She experienced a high level of pain after performing any activity. Tr. 183-185. Ms. Archer testified that she cannot finish tasks; she was unable to walk, stand or bend. *Id*. Ms. Archer reported fatigue to the extent that she must rest every 15 minutes between activities, and she needed help with household chores and meals. *Id*. At the April 1, 2010 hearing, Ms. Archer reported that she has a great deal of pain in her back, legs, shoulders, and wrists, and a high level

of stress. Tr. 46-47. Further, she stated that she cannot stand for long periods because of the knee pain. Tr. 43-44.

Despite Ms. Archer's testimony, the ALJ noted that Ms. Archer engaged in a wide range of daily activities, including household chores such as cleaning, vacuuming, mopping, making her bed, laundry, shopping for groceries, and handling her own finances. Tr. 20, 452. In addition to performing modified work as of October 2005, Ms. Archer took care of two grandchildren. Tr. 315. She also attended church activities and volunteer events. Tr. 20.

In response, Ms. Archer argues that she must take breaks in order to finish some of the household chores, and she receives has help from her children. Tr. 54-55. She adds that performing these chores exacerbates her pain. Tr. 57, 59.

Despite Ms. Archer's contentions, the ALJ noted that the record revealed that Ms. Archer participated in other activities beyond household chores, which conflicted with her subjective symptom testimony. Ms. Archer is very active in her church, where she has been a member for 25 years. Tr. 20. She participated in a series of church events, including a ten-day event out-of-town and a separate eight-day event. Tr. 715. In May 2007, she took computer classes. Tr. 20. In June 2007, Ms. Archer began volunteer work three times per week. Tr. 20-21, 668. She also cares for her son, helping him getting ready for school and with his homework. Tr. 390.

This evidence contradicts Ms. Archer's assertions that she "cannot finish any tasks," "cannot walk," and "cannot stand for a long time." This evidence also demonstrates that some of Ms. Archer's daily activities were not sporadically performed but were conducted on a continuing basis. These facts constitute "relevant evidence [that] a reasonable mind might accept as adequate to support [the ALJ's] conclusion." *Andrews*, 53 F.3d at 1039. As such, the ALJ did not err in citing Ms. Archer's daily activities to support the adverse credibility finding.

### 2.   Noncompliance with Mental Treatment

The ALJ also found that Ms. Archer failed to comply with recommended medical treatment for her mental impairments. Tr. 19-20. An ALJ may consider a claimant's failure to follow a prescribed course of treatment when weighing a claimant's credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). In doing so, however, an ALJ must consider a claimant's explanation for failing to undergo the recommended treatment. *See Smolen*, 80 F.3d at 1284. As the Ninth Circuit explained in *Fair v. Bowen*, it is the claimant's burden to adequately explain his or her failure to follow a prescribed course of treatment.  885 F.2d 597, 603 (9th Cir. 1989) (claimant's failure to explain failure to seek treatment or follow a prescribed course of treatment can "cast doubt" on the sincerity of his testimony); *see also Smolen*, 80 F.3d at 1293. An ALJ may discount a claimant's credibility due to an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Tommasetti*, 533 F.3d at 1039.

From September 2006 to April 2009, Ms. Archer did not attend 25 scheduled therapy sessions at Deschutes County Mental Health ("DCMH"). Tr. 19. Ms. Archer also failed to start prescription medicines for her sleep problem, which was her main complaint during that period. Tr. 558-74, 588. The ALJ reasoned that Ms. Archer had been counseled about sleep, which has a positive impact on mental health, "[but] it seemed she simply does not appreciate the resources being expended to try to help her and she [was] indifferent." Tr. 20.

The DCMH therapists' records explicitly discuss Ms. Archer's noncompliance and her explanations. In March 2009, a DCMH therapist indicated that Ms. Archer failed to take prescribed medicines, failed to fill them, and failed to follow up on the simplest methods available to improve her mental health. Tr. 930.  Ms. Archer's explanations for her noncompliance were conflicting. She reported to DCMH therapists that her failure to continue

PTSD and anti-anxiety work was because it interfered with her son's school schedule; she also told a facilitator that the treatment did not suit her needs. *Id.* Although Ms. Archer expressed to a therapist that her biggest issue was anxiety, she failed to follow up to a skilled therapist for treatment. Further, Ms. Archer constantly declined to endorse problems associated with depression and PTSD. *See* Tr. 930 ("Obviously, PTSD and depression are out and she states anxiety is her biggest issue . . . I also reminded her that [a recommended therapist] was noted for his work with clients who experience great anxiety and she had just had the best therapist in the clinic for working on anxiety, [y]et she failed to return for many appointments").

On other occasions, Ms. Archer has not been compliant with mental health treatments, particularly in her refusal to take psychotropic medicines as prescribed. She conceded that she ceased taking prescribed anti-depressants on March 6, 2007; she stopped taking all psychotropics in October 2007; and from March 2008, she took no medications at all. Tr. 679, 643. Ms. Archer argues that she experienced unpleasant side effects from several different medications, and she prefers to avoid medication for that reason. Tr. 580, 582, 716. Nonetheless, during this period, she also reported that she felt "pretty good" and very positive. Tr. 574. These conflicting assertions eroded the credibility of her "side effects" explanation, and even though she has legitimate reasons to stop taking the prescribed medications, her reports of good mental health status contradicted the her own subjective symptoms testimony.

Citing *Nguyen v. Chater*, Ms. Archer asserts that her reluctance to follow up the therapy and appointments is an aspect of her mental impairment that should not be chastised. 100 F.3d 1462, 1465 (9th Cir. 1996) (indicating that it is a poor practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation). The facts in *Chater*, however, are distinguishable from Ms. Archer's situation. In that case, the Ninth Circuit held that

the ALJ erred in discounting a doctor's assessment of the plaintiff's condition simply because the plaintiff failed to seek medical treatment. The court indicated that "depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness." *Id*. Thus, the fact that the plaintiff may be "one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [the doctor's] assessment of [the plaintiff's] condition is inaccurate." *Id*.

Ms. Archer, however, recognized that her symptoms of depression and anxiety were potential issues affecting her mental health. The record demonstrates that she has sought mental health treatment at DCMH for a substantial period of time. The ALJ properly noted that during her DCMH treating process, Ms. Archer constantly failed to follow the medial treatments and could not provide reasonable explanations for her noncompliance. As such, the ALJ did not err in taking Ms. Archer's noncompliance with medical treatment into consideration.

### 3.  Medical Evidence

The ALJ also found that medical evidence does not support Ms. Archer's subjective statements regarding the severity and persistence of her mental impairments. A lack of objective medical evidence, standing alone, may not serve as a clear and convincing reason to discredit the claimant's credibility when the ALJ has already determined that the claimant's impairments could produce some of the symptoms alleged. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted) ("[T]he medical evidence is still a relevant factor in determining the severity of the claimant's [symtoms].");  *Reddick*, 157 F.3d at 722. Here, however, the ALJ has already offered a legally sufficient reason for discounting Ms. Archer's testimony. Therefore, the ALJ's reliance on the objective medical evidence was not legal error.

Ms. Archer asserted that she has experienced anxiety for years, which has progressively become worse. Tr. 186. Ms. Archer also testified that she was depressed and anxious, which makes her occasionally angry sometimes, and she feels fear "from the time she gets up to the time she goes to bed." Tr. 186-89.

Ms. Archer's mental status evaluations at DCMH, which is the only source that treated Ms. Archer's mental health for an extended period, support the ALJ's findings. Tr. 18. Ms. Archer's treatment records generally reflect normal symptoms. Tr. 574, 577, 586, 611, 646, 648, 716, (recording Ms. Archer's appropriate appearance, good hygiene, interest/friendly attitude, normal speech, normal thought content, normal behavior, orientation times four, good insight/judgment, normal memory, intact reality and average intelligence). In May 2008, a DCMH therapist stated that Ms. Archer was currently working successfully with no evidence of significant anxiety or depression. Tr. 561. In September 2008, a DCMH therapist found Ms. Archer's presentation warranted no diagnosis. *Id.* These records contradict Ms. Archer's subjective testimony about the severity of her mental impairments.

The ALJ also reasonably gave weight to the recorded Global Assessment of Functioning ("GAF") scores accessed by the DCMH therapists. On September 26, 2006, a DCMH therapist assigned Ms. Archer a GAF score of 55. Tr. 561. On June 27, 2007, the same therapist assigned Ms. Archer a score of 70. *Id.* Another DCMH therapist in a later report assigned Ms. Archer a GAF back to 55 on July 25, 2007, Tr. 560, but on April 28, 2008, that therapist assigned Ms. Archer a score of 68. *Id.* These GAF scores reflect Ms. Archer's generally normal mental status, which does not comport with her symptom testimony, particularly regarding the longevity of her

impairments. As such, the ALJ did not err in concluding that Ms. Archer's testimony regarding her mental impairments was not supported by the objective medical evidence.[1]

In summary, the ALJ provided several clear and convincing reasons for finding Ms. Archer's statements regarding the severity of both her mental and physical impairments symptoms not credible; thus, the ALJ's credibility determination is affirmed.

## B.  Medical Opinions

Ms. Archer argues that the ALJ improperly rejected the opinions of three treating and examining physicians.  The Ninth Circuit distinguishes between the opinions of three types of physicians:  treating physicians, examining physicians, and non-examining physicians.

The opinions of treating physicians are generally accorded greater weight than the opinions of non-treating physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating doctor's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If a treating doctor's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating doctor's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

In addition, the ALJ generally must accord greater weight to the opinion of an examining physician over that of a non-examining physician.  *Lester*, 81 F.3d at 830. As is the case with the

---

[1] According to the American Psychiatric Association, a GAF score between 61 and 70 indicates someone with "some mild symptoms but generally functioning pretty well." Tr. 19. The ALJ reasoned that Ms. Archer's later trend toward very high GAFs, achieved very rapidly, showed either an acute improvement with mental health care or an acute realization on the part of her treatment providers at DCMH that Ms. Archer's subjective complaints were not credible. Tr. 18. Under either explanation, Ms. Archer's testimony concerning her alleged severity of impairment is not be supported by medical evidence. *See Warre v. Commissioner of Social Security Administration,* 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling").

opinion of a treating physician, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer v. Sullivan*, 908 F.2d 502 at 506 (9th Cir. 1990). If the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester,* 81 F.3d at 830.

### 1. Dr. Trueblood

Dr. William Trueblood, a psychologist, evaluated Ms. Archer in October 2006 and January 2008. Tr. 17. The ALJ rejected Dr. Trueblood's opinions because they were unsupported by his treatment notes and based on Ms. Archer's discredited subjective symptoms testimony.  Tr. 17.

In October 2006, Dr. Trueblood evaluated Ms. Archer. He conducted a clinical interview and gave her a battery of psycho-diagnostic tests Tr. 388. As a result of this evaluation, Dr. Trueblood opined that Ms. Archer was not able to maintain employment because of her psychological conditions. Tr. 394. Dr. Trueblood diagnosed the following mental impairments: mild and recurrent major depression, PTSD, panic disorder with mild agoraphobia, pain disorder, and avoidant personality characteristics. *Id.* Dr. Trueblood indicated that his evaluation of Ms. Archer's personality functioning and emotional status suggested that she was depressed and dysthymic. Tr. 393. Dr. Trueblood diagnosed Ms. Archer major depressive disorder, because anxiety was a prominent part of her presentation, and PTSD. Tr. 393-94. Dr. Trueblood stated that Ms. Archer's panic disorder, which appeared to include mild agoraphobia, together with her depression, contributed to her low motivation and low stress tolerance, affecting Ms. Archer's capability to maintain employment. Tr. 394.

In January 2008, Dr. Trueblood conducted a second psycho-diagnostic evaluation of Ms. Archer, and he then compared his later findings with his earlier assessments.[2] Tr. 450-55. In his second opinion, Dr. Trueblood endorsed his prior diagnoses and also found Ms. Archer suffered from generalized social phobia. Tr. 455. Dr. Trueblood concluded that Ms. Archer's combined mental impairments left her with a mild impairment in her ability to understand and remember instructions. *Id*.

Ms. Archer argues that the ALJ improperly rejected Dr. Trueblood's opinions because: (1) Dr. Trueblood performed tests on Ms. Archer in addition to the clinical interview; and (2) the ALJ improperly substituted his own judgment for that of Dr. Trueblood's by opining on the significance of Ms. Archer's behavior during treatment sessions.

Dr. Trueblood's evaluation, however, is contradicted by the opinion of Dr. Frank Lahman, a consultative psychologist, who opined that Ms. Archer's mental impairments are nonsevere. Tr. 434. Although Dr. Lahman offered the same diagnoses as Dr. Trueblood, Dr. Lahman concluded that Ms. Archer had only mild limitations in social functioning and in concentration, persistence, and pace. Tr. 425-33. Because the ALJ discounted the opinions of Dr. Trueblood and gave greater weight to the opinions of Dr. Lahman, the ALJ must provide specific and legitimate reasons. The ALJ did so. The ALJ rejected Dr. Trueblood's opinions for inconsistency with his own clinical findings, relying on Ms. Archer's discredited subjective symptoms testimony, and lacking objective medical support. These are specific and legitimate reasons to reject a contradicted medical opinion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Turner v. Comm'r,* 613 F.3d 1217, 1223 (9th Cir. 2010).

---

[2] There were no further IQ, memory, or personality tests conducted for the second evaluation. *See* Tr. 450-55.

In the October 2006 evaluation, Dr. Trueblood conducted several tests on Ms. Archer; the results, however, showed that Ms. Archer's intellectual skills were in the high average range and her memory skills appeared to be within the normal range. Tr. 394. In his 2008 evaluation, Dr. Trueblood indicated that although there was no significant change in Ms. Archer's memory over time since October 2006, her ability to understand and remember instructions was now rated as mildly impaired. Tr. 455. Dr. Trueblood stated that when he made his evaluations, he "combined [the tests results] with information from other sources, such as interview and history." Tr. 393. Therefore, despite of his own normal findings, Dr. Trueblood concluded that Ms. Archer was not able to work. Because the ALJ properly found that Ms. Archer's testimony about her subjective symptoms was not credible and Dr. Trueblood's opinions were inconsistent with his own clinical findings, the ALJ's reasons for rejecting the opinions were supported by substantial evidence.

The ALJ also considered Ms. Archer's other mental health treating records that do not support Dr. Trueblood's opinions. As discussed above, according to the DCMH therapists' extensive treatment records, Ms. Archer presented generally normal symptoms. Tr. 568. The DCMH's intake assessment in September 2006 showed the result of Ms. Archer's mental evaluation was unremarkable with few diagnostic symptoms. Tr. 567.  Thus, in sum, the ALJ properly rejected Dr. Trueblood's opinions for the specific and legitimate reasons.

### 2.  Dr. Maloney

Dr. Nancy Maloney treated Ms. Archer's physical impairments from October 10, 2005 to March 16, 2006. She evaluated Ms. Archer's physical residual function capacity on March 29, 2007.

In her 2006 treatment notes, Dr. Maloney found that the Ms. Archer's lumbar spine had a full range of motion, her right knee had a full range of motion, and her hip pain had improved.

Dr. Maloney indicated that Ms. Archer's lower extremities had full motor strength, intact sensation, normal coordination, and intact reflexes and she also had normal gait. Tr. 315-20, 322-31. On January 23, 2006, Dr. Maloney released Ms. Archer for a full time sedentary employment; however, a hand-written correction appears in the notes, where the words "full time" are crossed out and "part time" is written in. Tr. 323.

Dr. Maloney's 2006 treatment findings are consistent with other evidence in the medical record. In October 2005, x-rays of Ms. Archer left hip showed no fractures or dislocations. Tr. 271. On October 13, 2005, Robert L. Shannon, M.D., an orthopedist, saw Ms. Archer for complaints of generalized pain in her right shoulder, right hip, and right knee. Tr. 386. He found that beyond tenderness and a slight valgus deformity about her right knee, Ms. Archer's shoulders, hips, and knees had full range of motion, normal strength, and intact sensation. *Id*.

Despite the normal or mild findings in her treatment notes, Dr. Maloney opined that Ms. Archer was substantially impaired. In 2007, Dr. Maloney opinioned about Ms. Archer's physical functional limitation in the "check-the-box" form without specific references to her treatment notes. Dr. Maloney stated that Ms. Archer could not lift ten pounds even occasionally, stand or walk for more than two hours per day, or sit for more than six hours per day. Tr. 440-41.  Dr. Maloney ultimately concluded that Ms. Archer was incapable of working. *Id*.

In September 2006, however, Dr. Bollum found that Ms. Archer's right shoulder had symmetric full range of motion, full strength in abduction and 4/5 strength in external rotation. Tr. 25, 806. In March and April 2007, primary care physician, Pamela J. Irby, M.D., found that while Ms. Archer's lumbar spine had a decreased range of motion due to pain, her lower extremities had normal neurologic findings. Tr. 514, 516. In May and July 2007, Kent D. Yundt, M.D., a neurosurgeon, evaluated Ms. Archer for her waxing and waning lumbar spine pain, and

objectively found that except for tenderness about the lower thoracic spine and paraspinal musculature, her spine and upper and lower extremities demonstrated a normal neurological and musculoskeletal profile. Tr. 444-49.

This evidence demonstrates that Dr. Maloney's 2007 "check-the-box" opinion did not comport with her objective findings and was contradicted by other opinions and medical evidence in the record. As such, the ALJ properly discounted Dr. Maloney's opinion for specific and legitimate reasons.

Ms. Archer argues that the ALJ erred in finding that Dr. Maloney intended to release Ms. Archer to full time sedentary work, as reflected in his January 23, 2006 treatment notes. Dr. Maloney explicitly indicated in two places that the sedentary work release of January 23, 2006, was to full-time employment, which was continued and updated on February 23, 2006. Tr. 321-22. On March 16, 2006, Dr. Maloney again indicated that Ms. Archer was released for a full time position. Tr. 320. Substantial evidence thus supports the ALJ's determination that Dr. Maloney's change in her January 2006 notes was a mistake and the release was not intended to be for part-time employment.

Ms. Archer also argues that the ALJ erred in giving little weight to Dr. Maloney's 2007 "check-the-box" opinion. An ALJ, however, is not required to accept a physician's opinion that is brief, conclusory, or inadequately supported by clinical findings. Further, a lack of explanation or basis in treatment for a particular finding by a physician is a specific and legitimate reason to give greater weight to a more detailed assessment. *See*, *e.g.*, *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003); *see also* 20 C.F.R. §§ 404.152(d)(3), 416.927(c)(3) (indicating that weight afforded a physician's testimony depends on "the degree to which they provide supporting explanations for their opinions").

Because Dr. Maloney's opinion was a "check-the-box" form that was inconsistent with other medical opinions and deviated from Dr. Maloney's own treatment notes, the ALJ has gave specific and legitimate reasons for discounting Dr. Maloney's 2007 opinion and did not err by giving it lesser weight. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding an ALJ properly rejected a report that did not contain any explanation for its conclusions).

### 3.  Dr. Henderson

On March 21, 2008, Dr. Henderson conducted a musculoskeletal examination of Ms. Archer. Tr. 458. Dr. Henderson found that Ms. Archer's spinal curvature in thoracic and lumbar area appeared normal; her gait was normal and not antalgic; examination of Ms. Archer's hands, shoulder, hips, knees, and ankles did not reveal any erythema, swelling, deformity, or joint instability. *Id.*  All four extremities also had normal muscle tone and bulk with full muscle strength. *Id*. Dr. Henderson noted that Ms. Archer's x-rays showed some findings of mild osteoarthritis in her knees, mild degenerative changes with respect to her lumbar spine, but her left and right hips were normal. Tr. 459-65. Dr. Henderson's objective findings in the examination report were consistent with Ms. Archer's former medical records, including Dr. Yundt's evaluation in July 2007, Dr. Irby's findings in March 2007, and Dr. Bollom's treatment notes from May 2008. Tr. 440-44, 514, 516. 787.

Despite the relatively normal findings, Dr. Henderson concluded that as of March 2008 Ms. Archer was capable of performing only part time work, four hours per day with five minutes breaks every ten minutes for at most two or three days per week. Tr. 459.

The ALJ rejected this conclusion but gave weight to Dr. Henderson's other findings. The ALJ listed three reasons for rejecting Dr. Henderson's conclusion: (1) Dr. Henderson's objective findings in the examination report were mild or normal, which did not support his conclusion; (2) Dr. Henderson did not review Ms. Archer's full medical record; and (3) Dr. Henderson's

opinion was based on Ms. Archer's discredited subjective reports rather than actual objective findings.

The ALJ properly found that Dr. Henderson relied upon Ms. Archer's subjective testimony to reach his ultimate conclusion. Ms. Archer reported to Dr. Henderson that she recently worked at Bend Villa "two days per week, 4 hours each day . . . and was able to take a break for least 5 minutes after 10 minutes works." Tr. 457. According to the ALJ, Dr. Henderson gave too much weight to Ms. Archer's subjective symptoms statements under the section "history of present illness" in the examination report, instead of his own objective findings. Because Dr. Henderson did not review Ms. Archer's prior medical record, which exposed her lack of credibility, Dr. Henderson erred in relying on Ms. Archer's discredited subjective symptoms statements.

The ALJ also concluded that Dr. Henderson's objective findings in his evaluation do not support his conclusion that Ms. Archer only has the capacity for part time employment because merely mild or normal findings obviously do not warrant such a restrictive opinion. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (supportability as a factor in weighing medical opinions). Because an ALJ is not required to accept a physician's opinion that is inadequately supported by clinical findings or relies on claimant's discredited subjective symptoms testimony, the ALJ properly discounted Dr. Henderson's examination report.

## C.  Lay Testimony

Ms. Archer argues that the ALJ did not properly consider the lay witness testimony from Ms. Archer's daughter, Sara Ball. Lay testimony as to a claimant's symptoms is competent evidence that must be taken into account. *Dodrill v. Shalala*, 12 F.3d 915. 919 (9th Cir. 1993). An ALJ must give reasons that are germane to each witness if the ALJ expressly discounts or

disregards such testimony. *See Lewis v. Apfel*, 326 F.3d 503, 511 (9th Cir. 2001); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006).

Ms. Bell testified that Ms. Archer's knees hurt constantly, she suffers pain if she bends, she can only stand 10-15 minutes, she can walk no more than one block, and she can only sit for 30 minutes. Tr. 171-79. Ms. Bell also noted that Ms. Archer feared strangers and suffers from stress, anxiety, and depression. *Id*.

At the April 2010 hearing, Ms. Bell testified that she lived three and a half hours away from Ms. Archer but recently moved back to help her function. Tr. 64. In a February 2007 report, Ms. Bell admitted that she did not see Ms. Archer in day-to-day life, but she visited Ms. Archer every other day to help her as much as she could. Tr. 172.

The ALJ gave little weight to Ms. Bell's statements because that the last time she lived with Ms. Archer was three and one-half years ago, thus, "she has not been around to observe adequately the claimant and her testimony is not consistent with the objective medical evidence." Tr. 27. Ms. Archer argues that a lay witness need not live in the same house in order to observe how a claimant functions, particularly if the witness sees the claimant multiple times per week.

Ms. Ball's testimony about Ms. Archer's symptoms is partially contradicted by the objective medical evidence and the evidence of Ms. Archer's daily activities. Ms. Archer performs a wide range of household chores and participates in many other activities demonstrating a physical capacity beyond what Ms. Ball described. Tr. 64. Ms. Ball testified that Ms. Archer could only walk very short distances before she needed to rest, yet the record shows that Ms. Archer walks on trails with therapy horses on a regular basis. Tr. 177, 175, 510, 514.

Moreover, even if the ALJ did err concerning the reason for discounting Ms. Ball's testimony, such an error would be harmless because Ms. Ball did not testify to any limitations

beyond those found in Ms. Archer's properly discredited testimony. *See Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (holding that an ALJ's failure to comment upon lay witness testimony is harmless where "the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims"). Accordingly, the ALJ's rejection of Ms. Ball's testimony was, at most, harmless error.

**D.  ALJ's RFC Formulation and Step Four Consideration**

Ms. Archer argues that the ALJ erred in formulating her residual functional capacity ("RFC") by excluding limitations supported by the record. In determining the RFC, an ALJ must consider limitations imposed by all of a claimant's impairments, even those that are not severe; the ALJ evaluates "all of the relevant medical and other evidence," as well as a claimant's testimony, in making this assessment.  SSR 96-8p; 20 C.F.R. §§ 404.1645(a), 416.945(a); *see Robbins*, 466 F.3d at 883; *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001) (holding that limitations supported by substantial evidence in the record must be incorporated into the RFC). Although the ALJ's question to the vocational expert must include all properly supported limitations in the claimant's RFC, it may exclude unsupported limitations. *Osenbrock*, 240 F.3d at 1164-65.

As discussed above, the Court rejects Ms. Archer's challenges to the ALJ's treatment of her credibility, the medical evidence, and the lay witness testimony. Accordingly, Ms. Archer has not established that the ALJ erroneously omitted any limitations from the RFC. The ALJ's RFC finding is thus supported by substantial evidence and is affirmed.

## CONCLUSION

The ALJ provided legally sufficient reasons for discrediting Ms. Archer's subjective symptoms testimony; discounting the opinions from Dr. Trueblood, Dr. Maloney, and Dr.

Henderson; and rejecting Ms. Ball's lay witness testimony. Thus, the decision that Ms. Archer is

not disabled is supported by substantial evidence in the record and is AFFIRMED.

**IT IS SO ORDERED**.

DATED this 2nd day of July, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge